**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1363-22

THOMAS KIELY, MICHAEL
MARZOVILLA, and 30 JACKSON
STREET, LLC,

      Plaintiffs-Appellants/
      Cross-Respondents,

v.

WILLIAM C. ILER,

      Defendant-Respondent/
      Cross-Appellant.

_____

30 JACKSON STREET, LLC,
and WILLIAM C. ILER,

      Plaintiffs,

v.

THOMAS KIELY, MICHAEL
MARZOVILLA, CHRISTOPER
MORAN, and MATTHEW
TAETSCH,

      Defendants.

_____

Argued October 2, 2023 – Decided February 12, 2024

Before Judges DeAlmeida and Berdote Byrne.

On appeal from the Superior Court of New Jersey, Chancery Division, Monmouth County, Docket Nos. C-000008-19 and C-000011-19.

Joel N. Kreizman argued the cause for appellants/ cross-respondents (Scarinci & Hollenbeck, LLC, attorneys; Joel N. Kreizman, of counsel and on the briefs).

Randolph H. Wolf argued the cause for respondents/ cross-appellants (Wolf Law, PC, attorneys; Robert W. Ruggieri, of counsel and on the brief; Randolph H. Wolf, on the brief).

PER CURIAM

In these cross-appeals, the parties appeal from a final order after a bench trial regarding various decisions made concerning their manager-managed, limited liability company, and a denial of a motion for reconsideration. For the reasons that follow, we conclude the trial court's failure to make sufficient findings of fact and conclusions of law warrants reversal and remand.

I.

We glean the following facts from the record. In 2015, Thomas Kiely (Kiely) and William Iler (Iler) formed 30 Jackson Street, LLC (LLC) with the intent to purchase a piece of property at that address in the Borough of

Highlands, New Jersey, refurbish it, and quickly resell it. Prior to forming the LLC, neither had prior dealings with the other. Iler, an attorney, prepared the initial agreements. Each became a fifty percent member of the LLC and together purchased the property for $140,000. Each member paid $20,000 towards the property acquisition, and together they took on a mortgage for $100,000 at six percent interest. Each agreed to pay fifty percent of the mortgage. Efforts to quickly resell the property were unsuccessful. In late 2016, Michael Marzovilla (Marzovilla), who also had no prior dealings with either founding member, approached the LLC to join their business venture as an investor.

On December 24, 2016, Marzovilla became a member of the LLC. The three members signed and executed an Amended Operating Agreement (AOA) and a Purchase Agreement, with Iler retaining a fifty percent membership interest and Kiely and Marzovilla each obtaining a twenty-five percent membership interest. In the AOA, the parties agreed to provide additional contributions to fund improvements and repairs to the property and operate the property as a hotel cottage ("SummerHouse"). Kiely and Marzovilla agreed to contribute $105,000 each. Iler would contribute another $105,000, oversee the improvements and repairs to SummerHouse, and manage the LLC.

According to the Purchase Agreement terms, Iler would be paid $30,000 by the LLC for management of renovations to the SummerHouse and an additional five percent of the gross rental income, before expenses, for rental management of the first operational season.  The AOA also addressed how loan contributions and capital contributions were to be treated by the LLC.  It states, in pertinent part:

> 9)  Loans.  All contributions advances or other infusions of cash by any Member into the Company, however made, and whether or not made by direct payment of Company obligations or expenses, shall conclusively be deemed loans to the Company. . . . . [A]ny asset transferred to the Company shall be presumed to be a loan rather than a capital contribution. Loans shall be repaid by the Company on a pro rata basis to the Members as cash becomes available after paying all other current obligations of the Company.

It also states:

> 10)  Front Loans, Dilution of shareholders interest.  In the event that any Member cannot or does not provide the Member's pro rata share of the funding required by the Company within 14 (fourteen) days after a funding requirement is communicated between the Managers, then the Member(s) who is/are able to provide the amount (who is then called a "Fronting Member") shall have the right to lend an additional amount on behalf of the non-paying member (who is then called a "Fronted Member").  This loan on behalf of another Member shall be called a ("Fronted Loan").  If a Fronted Loan is made, that Fronting Member has the right to notify the other member(s) that the amount of that Fronted Loan

4

shall be treated under this Agreement as a loan to the Fronted Member and shall bear interest at 7% per year until repaid. In the event that the Fronted Member has not fully paid the loan within 30 days after it is made, and after demand by the Fronting Member(s) for repayment, then the Fronting Member shall have the right, but [sic] the obligation, by written notice to the non-paying Member, to dilute the Non-paying Member's ownership interest in the Company, and transfer a portion of the Nonpaying Member's interest to the loaning party. The percentage of ownership interest in the Company which the Loaning Member may elect to transfer is calculated by dividing the principal amount of the loan by a sum equal to one-half of the total of all loans made to the Company by the Non-paying Member. Any transfer of ownership interest from any Member to another shall not affect the manner in which the Managers operate the Company unless and until a Member, by reason of such transfers of ownership interest, owns more than 60% of the total ownership interest in the Company. If and when this happens, the Manager serving the Company at the behest of the loaning Member shall thereupon have the right to manage and conduct the operations of the Company himself, except that the following decisions will still require the affirmative vote of both Managers [sic]:

a) A decision that the Company should borrow money from any other source, except from a Member.

b) Any Amendment to the Operating Agreement.

c) The amending of the Development Plans so as to increase the original, estimated cost of the restoration and refurbishment of the property by more than $30,000.00.

5

A-1363-22

The Manager serving at the behest of the Members shall also have the right to sign checks or expend monies and enter into contracts, without the requirement of any additional signatures. In the event that a Fronted Loan is eventually converted to an ownership interest in the Company, any interest due from the non-paying Member during the fronted period, shall be forgiven, and the loan shall be treated as principal-only in order to calculate the transfer of share value.

11) . . . . No Member shall make any in-kind contribution to the Company without the prior written approval of the other Member, which shall include an exact valuation of that contribution.

. . . .

15) <u>Disputes</u>. In the event of a dispute, the members agree to attempt to mediate it immediately and then arbitrate if no resolution can be reached. Prior to mediation or arbitration, the parties must first confer and discuss any dispute directly in good faith. If meeting in this manner does not succeed in resolving the dispute, then the parties agree to mediate, then, arbitrate the dispute. . . . The parties shall equally divide the cost of the arbitration, and the prevailing party shall be entitled to an award of its attorney and/or filling fees from the non-prevailing party. . . .

16) <u>Dissolution Voluntary and Involuntary</u>. The Company may be voluntarily dissolved upon the affirmative vote of a per capita-based simple majority of the Members. Upon dissolution, the Company shall wind up its affairs, and pay its creditors, including the Members on a pro-rata basis, unless any remaining members choose to pay the value of the company to the Members who wish to voluntary dissolve in which case

6

the company may continue without the members who have been paid out.

The SummerHouse opened in 2017 and had its first full summer in 2018. During that time, the members made various contributions and disbursements. They testified, because they did not know or trust each other, they sometimes made payments directly to contractors or suppliers. The SummerHouse repairs and expenses exceeded the $315,000 combined contributions of the three members as outlined in the AOA and the LLC began experiencing problems with cash flow. Iler, as managing member, made payments from accounts comingled with his personal accounts and other, unrelated project accounts.

In the beginning of 2018, Kiely and Iler were required to make the first mortgage payment, split between them. Kiely paid his portion of the mortgage, but Iler was not able to make the payment. He asked Kiely and Marzovilla to allow him to refinance the property to meet the obligation, but they declined. Instead, Marzovilla paid approximately $56,000 -- Iler's portion of the mortgage then due and owing.

The parties' relationship deteriorated further in summer 2018, when, without notifying the other two members, Iler left New Jersey to spend July and August in Florida instead of being physically present to manage the SummerHouse during its first summer. Iler testified he believed he did not need

7

to tell his partners or ask for permission, and he hired someone to be on-site. After that summer, Kiely and Marzovilla grew increasingly unhappy with Iler's performance as managing member. The members testified they experienced continuous cash flow issues and continuous issues involving Iler's accounting of expenditures and revenue.

On November 3, 2018, Kiely and Marzovilla held a meeting where they terminated Iler as the manager of the LLC and re-allocated the percentage of ownership amongst the members. Iler failed to attend the meeting, although he was given notice through multiple emails. At the meeting, Kiely and Marzovilla first "recognized" that Marzovilla's shares in the LCC had increased from 25% to 33% "through his February 2018 $56,000 payoff of 50% of the mortgage on the LLC's property." The minutes state:

> Because this payment was originally intended to be paid off by William Iler and he subsequently could not make that payment, Iler's shares were reduced from 50% to 42%. Therefore, the shareholders present represented a majority of [t]he LLC's shares. It was also recognized that while there [was] more work to do on the rebalancing of shares in [t]he LLC, that this subject would not be taken up at this time.

Keily and Marzovilla, having established majority voting power, then voted to remove Iler as managing member and appoint Kiely as the sole manager of the LLC.

8

Kiely and Marzovilla, both individually and derivatively, then filed a complaint against Iler, alleging breach of fiduciary duty, breach of contract, and tortious interference. Their six-count complaint did not seek dissolution of the LLC pursuant to N.J.S.A. 42:2C-48, but did seek injunctive relief against Iler, including his removal as manager and member. Iler filed a separate complaint a few days later, individually, and derivatively on behalf of the LLC, seeking a declaration that Kiely and Marzovilla had improperly diluted his shares, improperly removed him as managing member, and improperly amended the operating agreement. He sought reinstatement as the manager and other injunctive relief but did not claim minority member oppression pursuant to N.J.S.A. 42:2C-48(a)(5)(b) and did not seek dissolution of the LLC. The two complaints were consolidated.

After hearing oral arguments on the return of the order to show cause, the trial court entered an order: (1) naming Kiely as the managing member of the LLC, pending trial; (2) requiring Iler turn over certain LLC property; and (3) continuing restraints against Iler. The court also ordered the parties to engage a joint accountant to audit the business and meet and confer with each other in attempts to reach agreement. The parties jointly retained a real estate appraiser, Robert Gagliano, who determined the value of the LLC's real property was

A-1363-22

$830,000 as of April 25, 2020, specifically noting the value had been affected by the worldwide global COVID-19 pandemic.

Trial began in June 2021 before a different judge, but due to the COVID-19 pandemic, did not conclude until June 2022. The trial court issued a written decision on June 29, 2022.

In its findings, the trial court noted Iler sought a declaration that the actions taken by his co-members on November 3 be declared null and void; the percentage reallocation of ownership interest at that meeting be vacated; he be reinstated as the manager of the LLC; and any amendments to the governing documents be declared void. The trial court denied the requests and found, without further elaboration, the actions of Kiely and Marzovilla at the meeting were valid, done in the best interest of the LLC, and Iler had adequate and sufficient notice of the meeting but failed to attend. The trial court stated:

> It was clear to anyone even remotely involved with this LLC that actions were going to be taken regarding the management and the moving forward of the -- of the business. And the relationship between the three partners: particularly Kiely and Marzovilla's and Mr. Kiely's relationship with Iler was not good, and certainly, not one that would be in accordance with the proper functioning of the LLC.

Although Iler argued the $56,000 payment by Marzovilla was a loan to the LLC pursuant to the terms of the AOA, the trial court found the payment

was an exchange by Marzovilla "for him receiving a percentage of Mr. Iler's ownership interest in the LLC," without reference to language of the Purchase Agreement or AOA.

The court found Iler was left with a 43.26% ownership interest, Marzovilla with 31.74%, and Kiely with 25% ownership interest, but failed to analyze, discuss, or even mention the explicit contractual language in the AOA or Purchase Agreement.

The court considered the testimony and reports of two CPA expert witnesses: Brad Balmuth from Smolin, the parties jointly retained forensic accountant, and Christopher Whelan, Iler's expert. The accountants both tried to reconcile the LLC's financial reports. The court found the Smolin report more credible, in terms of loans and contributions. However, the court found Mr. Whelan more helpful and clear in his testimony. During trial, the court asked Mr. Whelan to make certain additional calculations the court relied upon to conclude the aforementioned ownership interest percentages were accurate and "the buyout per partner share of estimated property value [,] including loans due with interest[,]" was $250,677 for Iler, $212,022 for Marzovilla, and $367,301 for Kiely, based upon the estimated value of the property of $830,000.

11

Next, the court addressed the breach of fiduciary duty. It stated: "Both parties argued breach of fiduciary duty, . . . that their respective partners had breached the contract; that they were oppressed shareholders based on the conduct of the other parties." The court noted the actions of all members were "less than optimal." It found Kiely and Marzovilla "appropriately" removed Iler as managing member because of Iler's actions, without documenting what those actions were, but found the other members' actions were also not "up to standards." The court noted Iler's "subpar conduct" included "[g]oing to Florida for the last couple of months, hiring someone without advising his partners, [and] not keeping separate ledgers." It also found plaintiffs were likely aware or "based on reasonable inquiry" would have known about these issues and failed to act.

Despite these findings, the court did not find that the "conduct of any of the members rise to the level of conduct that gives rise to an independent and separate cause of action" pursuant to the Revised Uniform Limited Liability Company Act ("RULLCA"), N.J.S.A. 42:2C-1 to -94, or the Oppressed Shareholder Act, N.J.S.A. 14A:12-7(1)(c), neither of which were pled by any party. It did find both Kiely and Iler were less than diligent in pursuing their respective responsibilities when compared to Marzovilla.

12

The court spent a considerable amount of time documenting the high level of anger, animosity, and distrust between the parties that thwarted any effort at settlement. It stated:

> I don't think that these three members can adequately discuss anything. I saw their demeanor in the courtroom. I saw their conduct in the courtroom, and quite frankly, I don't think they could agree on anything. Therefore, I will give them the opportunity to buy out willingly each other's share of the LLC, but they are not limited to the [property] valuation in the Gagliano report.
>
> If they do not come to an agreement for the sale, then I'm going to order that the parties place this property for sale with a broker on the open market, and that they distribute the proceeds in accordance with the [c]ourt's findings as reflected in [the ownership interest submission.] They just simply need to -- that contains an estimated property value. There will be a real property value if the parties cannot agree.

After the trial court entered its written decision on June 29, 2022, Kiely and Marzovilla filed a motion for reconsideration of certain paragraphs of the court's order. First, they argued the court's assessment of the ownership percentage was not based on the parties' agreement because the AOA and Purchase Agreement set forth ownership interest based on capital contributions, but the court treated the disbursements they made as loans instead of

contributions. Additionally, they argued Iler agreed in an email to the dilution of his shares.

Second, Kiely and Marzovilla argued Iler per se breached his fiduciary duty to the LLC because he commingled his personal and other project funds with the LLC's funds and could not account to them. The court in fact found he commingled the LLC's funds on five separate occasions and, based upon N.J.S.A. 42:2C-39, they argued the court should have found Iler breached the AOA and his fiduciary duty to the LLC.

Third, Kiely and Marzovilla argued the court's decision to require unanimity with respect to the valuation or otherwise SummerHouse would be put up for sale was ultra vires because no party sought dissolution of the LLC.

Iler argued the trial court found each member was at fault for the accounting issues and they all managed the LLC as amateurs, so no one had clean hands. Each paid out of their personal bank accounts and directly to the LLC. He noted, by having submitted their claims to a court of equity, they were now bound by the trial court's "fair" decision.

The court denied the motion for reconsideration in its entirety, and found it unfair, particularly to Iler, to be "stuck with a stale valuation and as the minority member, he would be forced to sell at a substantially deflated and

unfair price."  The trial court also ultimately decided it was not going to revisit Kiely's percentage of ownership.  In its holding, the court stated:

> So, . . . as a court of equity, I sit here and see an incredibly stale valuation.  I think the valuation was actually . . . $830,000 for interest in property?  And that is obviously a stale valuation.  So, I think that I equitably provided that the parties should have a discussion between themselves to see if they can work out something.  Apparently, [Iler's counsel's] position is let's list it for sale, and [the other members] have the right of first refusal.  That sounds like a reasonable accommodation, but I can't see any way that they're going to agree on a new valuation.  I can't see any way that they're going to agree on anything.  So, I think that my decision that if they can't agree, that the property be sold was a good and valid one based on the evidence and the inner relationship between these three partners.

The trial court later modified its order by adding that upon sale, each party would have a right of first refusal.  These appeals followed.  We granted a stay of the part of the order requiring the parties to unanimously agree upon a new appraisal for the LLC's real property, or the property would be listed for sale, pending final resolution of the appeal.

II.

Kiely and Marzovilla appeal from the trial court's final order after trial and denial of their motion for reconsideration, arguing the court erred:  1) in finding Iler did not breach his fiduciary duty; 2) in ordering the sale of LLC's

15

sole asset, 3) in setting aside a valuation by a jointly retained appraiser; and 4) in finding each party would bear the cost of their own attorney fees.

Iler filed a cross-appeal where he "conditionally appeal[ed]" the final judgment, but his brief only opposes Kiely and Marzovilla's appeal and recommends affirmance.

Our review of a trial court's fact-finding in a non-jury case is limited. Seidman v. Clifton Sav. Bank, S.L.A., 205 N.J. 150, 169 (2011). "The general rule is that findings by the trial court are binding on appeal when supported by adequate, substantial, credible evidence." Ibid.

However, we owe no deference to a trial court's interpretation of the law, and review issues of law de novo. State v. Parker, 212 N.J. 269, 278 (2012) (citing State v. Handy, 206 N.J. 39, 45 (2011)); Cumberland Farms, Inc. v. N.J. Dep't of Env't Prot., 447 N.J. Super. 423, 438 (App. Div. 2016). Mixed questions of law and fact are also reviewed de novo. In re Malone, 381 N.J. Super. 344, 349 (App. Div. 2005).

Similarly, "[t]he interpretation and construction of a contract is a matter of law for the trial court, subject to de novo review on appeal." Cumberland Farms, 447 N.J. Super. at 438; Kieffer v. Best Buy, 205 N.J. 213, 222-23 (2011); see Serico v. Rothberg, 234 N.J. 168, 178 (2018). This court is to look upon a

contract with "fresh eyes," owing no special deference to the interpretation of the trial court. Kieffer, 205 N.J. at 222-23.

We review the denial of equitable remedies for abuse of discretion. Sears Mortg. Corp. v. Rose, 134 N.J. 326, 354 (1993); see Kaye v. Rosefielde, 223 N.J. 218, 231 (2015) ("Chancery judge has broad discretionary power to adapt equitable remedies to the particular circumstances of a given case") (quoting U.S. Bank Nat'l Ass'n v. Guillame, 209 N.J. 449, 476 (2012)). "An abuse of discretion occurs when a trial court makes 'findings inconsistent with or unsupported by competent evidence,' utilizes 'irrelevant or inappropriate factors,' or 'fail[s] to consider controlling legal principles.'" Steele v. Steele, 467 N.J. Super. 414, 444 (App. Div. 2021) (alteration in original) (quoting Elrom v. Elrom, 439 N.J. Super. 424, 434 (App. Div. 2015)).

Likewise, the decision to award counsel fees is within "the sound discretion of the trial court." Wear v. Selective Ins. Co., 455 N.J. Super. 440, 459 (App. Div. 2018) (quoting Maudsley v. State, 357 N.J. Super. 560, 590 (App. Div. 2003)).

We conclude the court failed to make sufficient findings from the record evidence to support its conclusions. Rule 1:7-4(a) obligates the trial court to "find the facts and state its conclusions of law thereon in all actions tried without

17

a jury . . . ." Our review is severely inhibited when the trial court fails to elaborate upon the reasons for its opinion. Romero v. Gold Star Distrib., LLC, 468 N.J. Super. 274, 304 (App. Div. 2021) (quoting Giarusso v. Giarusso, 455 N.J. Super. 42, 53 (App. Div. 2018)). Naked conclusions cannot satisfy the requirements of Rule 1:7-4(a). Ibid. (quoting Giarusso, 455 N.J. Super. at 54); see also J.D. v. M.D.F., 207 N.J. 458, 488 (2011).

We are constrained to remand the matter to the trial court for findings of fact and conclusions of law, and, if necessary, additional briefing or hearings. See Band's Refuse Removal, Inc. v. Borough of Fair Lawn, 64 N.J. Super. 1, 5 (App. Div. 1960) (The Appellate Division may attach conditions "to a reversal where the circumstances and the demands of justice require."). This includes the ability to remand a case to the trial court for review of the record, and, if found necessary by the trial court, for further proceedings. In re Tr. Created by Agreement Dated Dec. 20, 1961, ex rel. Johnson, 194 N.J. 276, 284 (2008); see State v. Henderson, 433 N.J. Super. 94, 105 (App. Div. 2013) (conditioning the grant of a new trial to success at a plenary hearing to exclude certain evidence).

## III.

A.    Breach of Fiduciary Duty.

A managing member of an LLC owes a fiduciary duty to his co-members. N.J.S.A. 42:2C-39; Silverstein v. Last, 156 N.J. Super. 145, 152 (App. Div. 1978).  This includes the duty "to account to the company and to hold as trustee for it any property, profit, or benefit derived by the member . . . in the conduct . . . of the company's activities . . . ."  N.J.S.A. 42:2C-39(b)(1)(a).  The trial court's bare findings, treating all three members equally for purposes of determining whether any breached their fiduciary duty to one another, without differentiating Iler's status as manager, and without reference to Iler's statutory obligations, are insufficient.  See N.J.S.A. 42:2C-39(i)(1) (limiting the fiduciary duties in a manager-managed LLC to "the manager or managers and not the members" of the LLC).

The court found only that none of the conduct by any member "rise[s] to the level of conduct which gives rise to an independent and separate cause of action" pursuant to RULLCA.  It found "the conduct of all of the members was, in retrospect, unfortunate, and certainly under the circumstances, not entirely reasonable, but [the court did not believe] it was done with malice. . . . [or] with the intent to hurt any of the other members."  Instead, it thought the parties'

A-1363-22

actions "were out of a sense of conduct that was not up to standard. It's more in the tune of negligent conduct, and this is true on the multiple examples that have been given." However, neither malice nor negligence is required by the statute.

Likewise, the court's findings that Iler comingled the LLC's funds, and Keily and Marzovilla had a valid, legal basis to remove Iler as manager, contradicts its prior finding that Iler did not breach any fiduciary duty to his co-members and is not supported by reference to statute, caselaw, or the operating documents.

Further, the court's upholding of the dilution of Iler's shares without determining whether his co-members followed procedures outlined in the AOA or governing law cannot stand because the trial court failed to address whether Keily and Marzovilla breached any fiduciary duty they owed Iler.

B.    Dissociation and Dissolution.

Kiely and Marzovilla argue the trial court had no contractual or statutory basis to order the sale of the LLC's only asset, effectively dissolving the LLC. We agree the trial court failed to make findings sufficient to allow it to order the sale of the LLC's only asset.

20

The AOA[1] from 2018 did not include a change to the parties' 2016 dissolution and dissociation provisions. The 2016 AOA provided a provision addressing involuntary dissolution: The "involuntary removal of the [m]ember from participation, shall cause that [m]ember's ownership to immediately revert to the remaining [m]embers in pro rata share to other [m]embers interest at that time." However, Marzovilla was not a signatory to that operating agreement.

If the governing documents do not address a specific situation amongst members, the default provisions of the RULLCA govern the operation and structure of a limited liability company and the relations among the members in situations not addressed. N.J.S.A. 42:2C-1; see Union Cnty. Improvement Auth. v. Artaki, LLC, 392 N.J. Super. 141, 152 (App. Div. 2007). RULLCA limits dissolution of an LLC to six specific circumstances. N.J.S.A. 42:2C-48(a). The court is empowered to order dissolution only in four of those instances, each requiring the petition by a member. N.J.S.A. 42:2C-48(a)(4), (5). It states:

> a. A limited liability company is dissolved, and its activities shall be wound up, upon the occurrence of any of the following:

---

[1] The record does not provide the second amended operating agreement with revisions made by Kiely and Marzovilla at the November 3, 2018 meeting. However, they provide the minutes from the meeting where the parties include the relevant changes to the AOA.

(4) on application by a member, the entry by the Superior Court of an order dissolving the company on the grounds that:

(a) the conduct of all or substantially all of the company's activities is unlawful; or

(b) it is not reasonably practicable to carry on the company's activities in conformity with one or both of the certificate of formation and the operating agreement; or

(5) on application by a member, the entry by the Superior Court of an order dissolving the company on the grounds that the managers or those members in control of the company:

(a) have acted, are acting, or will act in a manner that is illegal or fraudulent; or

(b) have acted or are acting in a manner that is oppressive and was, is, or will be directly harmful to the applicant.

[N.J.S.A. 42:2C-48(a)(4), (5).]

Similarly, dissociation by judicial order requires prior application by the LLC or a member and is permitted only where the member:

(1) has engaged, or is engaging, in wrongful conduct that has adversely and materially affected, or will adversely and materially affect, the company's activities;

(2) has willfully or persistently committed, or is willfully and persistently committing, a material breach

22

of the operating agreement or the person's duties or obligations under [N.J.S.A. 42:2C-39]; or

(3) has engaged, or is engaging, in conduct relating to the company's activities which makes it not reasonably practicable to carry on the activities with the person as a member . . . .

[N.J.S.A. 42:2C-46(e) (footnote omitted).]

By finding no party proved his case, the court did not provide a valid legal basis to order dissociation or dissolution. Evidence the parties did not get along, or the court's authority as a court of general equity, is not sufficient. A court of equity must still follow the law and courts of equity "will generally conform to established rules and precedents, and will not change or unsettle rights that are created and defined by existing legal principles." W. Pleasant-CPGT, Inc. v. U.S. Home Corp., 243 N.J. 92,108 (2020) (quoting Dunkin' Donuts of Am., Inc. v. Middletown Donut Corp., 100 N.J. 166, 183 (1985)); see IE Test, LLC v. Carroll, 226 N.J. 166, 182-83 (2016) (finding dissociation of a member pursuant to N.J.S.A. 42:2C-46 proper only when it is "unfeasible, despite reasonable efforts, to keep the LLC operating while the disputed member remains affiliated with it").

Kiely and Marzovilla petitioned the court to "expel Iler from the LLC" although they did not allege a specific count for dissociation. This arguably

23

afforded the trial court the ability to dissociate Iler from the LLC upon a finding of specific cause. However, if the court had made that finding, it would be empowered to order only that the co-members buy out Iler's shares at fair value, not dissolve the LLC. N.J.S.A. 42:2C-47(c). Having found no illegal or unlawful conduct, and no party having sought dissolution of the LLC or the sale of the LLC's property, the trial court was without authority to order the sale of the property, which would effectively dissolve the LLC.

The court ordered the parties to unanimously agree to a valuation of the LLC's real property, which it equated to share value. Without referring to the operating documents, if the parties could not agree, it ordered the sale of the real property, the LLC's sole asset. In doing so the trial court employed a technique often used in mediation to avoid resolving a disputed material issue before it — the fair value of Iler's shares for the court-ordered buy-out of his percentage of ownership.

C.    Valuation of the LLC's Shares.

Assuming dissociation was appropriate, with respect to the valuation of the LLC's shares, each member's contributions, and each member's percentage of ownership, the trial court made no references to the AOA, Purchase Agreement, or evidence admitted at trial in its determination as to how it arrived

at its conclusions. Both documents are specific with respect to which contributions are attributable to percentage of ownership and which contributions are deemed loans. We give contracts "their plain and ordinary meaning" and courts will not make a different or better agreement for the parties than they made for themselves. Kieffer, 205 N.J. at 223 (quoting M.J. Paquet, Inc. v. N.J. Dep't of Transp., 171 N.J. 378, 396 (2002)); (citing Zacarias v. Allstate Ins. Co., 168 N.J. 590, 595 (2001)). Instead, the court made credibility determinations of the experts, relied on portions of one expert's testimony and findings of another, without further explanation, and without reference to the controlling documents.

The court also disregarded the valuation of the real property without referring to case law regarding the proper date of valuation for purposes of dissociating Iler. To the extent the minority shareholder oppression act may apply, although it was not pled, it provides in pertinent part: "[t]he purchase price of any shares so sold shall be their fair value as of the date of the commencement of the action or such earlier or later date deemed equitable by the court, plus or minus any adjustments deemed equitable by the court . . . ." N.J.S.A. 14A:12-7(8)(a). Generally, the date of commencement of the action is the presumptive date of valuation. Musto v. Vidas, 333 N.J. Super. 52, 63 (App.

25

Div. 2000). see also Torres v. Schripps, Inc., 342 N.J. Super. 419, 437 (App Div. 2001). Trial courts are permitted to change the date of valuation in the interest of equity. Torres, 342 N.J. Super. at 437 (citing Vidas, 333 N.J. Super at 63); see Sipko v. Koger, Inc., 251 N.J. 162, 181, 183 (2022) (reiterating that equitable principles permit the court to "apply a discount to the value of the dissenting shareholders' stock") (quoting Lawson Mardon Wheaton, Inc. v. Smith, 160 N.J. 383, 400 (1999)).

The presumptive date for valuation of the shares of the LLC, not the value of the real property, was January 2019, the filing month of both complaints, and well before the COVID-19 pandemic affected the real estate market. Although the trial court had the discretion to deviate from that date, it was required to expound on its reasons for doing so.

D.      Attorney's Fees.

"In the field of civil litigation, New Jersey courts historically follow the 'American Rule,' which provides that litigants must bear the cost of their own attorneys' fees." Innes v. Marzano-Lesnevich, 224 N.J. 584, 592 (2016). "However, 'a prevailing party can recover those fees if they are expressly provided for by statute, court rule, or contract.'" Litton Indus., Inc. v. IMO

Indus., Inc., 200 N.J. 372, 385 (2009) (quoting Packard-Bamberger & Co., Inc. v. Collier, 167 N.J. 427, 440 (2001)).

Kiely and Marzovilla argue the trial court failed to award them attorney's fees although the court found in their favor and their AOA, amended after they removed Iler, provides for the award of attorney's fees to the prevailing party in a lawsuit. They argue the trial court found their actions at the November 2018 meeting were appropriate and their newly amended agreement states:

> any member, or the LLC upon the majority vote of the percentage interest of the members, may commence the appropriate action in the New Jersey Superior Court. In any such action, the prevailing party shall be entitled to an award of reasonable counsel fees as part of any relief awarded.

The prior AOA discussed the award of attorney fees only at arbitration. Paragraph fifteen stated the "parties shall equally divide the cost of . . . arbitration, and the prevailing party shall be entitled to an award of its attorney . . . fees from the non-prevailing party."

In its decision the court stated, "the conduct of all three members contributed to th[e] dispute and unquestionably contributed to the submission of over one hundred (100) trial exhibits and days of testimony of both lay and expert witnesses resulting in the costs of th[e] litigation increasing beyond any reasonable expectation."

A-1363-22

The LLC's newly amended operating agreement includes a change to its dispute section. To the extent the trial court found the amendment of the AOA was appropriate after Iler's dilution of shares, it failed to state why the provision did not apply. On remand, the court should assess the validity of any award of attorney fees in accordance with what it concludes are the governing documents.

In sum, we reverse and remand for specific findings of fact and conclusions of law. The trial court may rely upon the evidence adduced at trial, but is not limited to that evidence, and may request additional briefing or testimony, if necessary. We take no position regarding the outcome of any of the substantive issues raised in this appeal other than the trial court's failure to make adequate findings.

Reversed and remanded for findings consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1363-22